No. 2--00--0566     

 IN THE

 APPELLATE COURT OF ILLINOIS

 SECOND DISTRICT

 

McDONALD'S CORPORATION,

Plaintiff-Appellant,

v.

AMERICAN MOTORISTS INSURANCE COMPANY, CENTURY INDEMNITY COMPANY AND INDEMNITY INSURANCE COMPANY OF NORTH

AMERICA, and ST. PAUL SURPLUS LINES INSURANCE COMPANY,

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the Circuit Court of Du Page County.

No. 97--L--0144

Honorable

Hollis L. Webster,

Judge, Presiding.

JUSTICE GROMETER delivered the opinion of the court:

This appeal involves an insurance coverage dispute.  Plaintiff-insured, McDonald's Corporation (McDonald's), appeals from an order of the circuit court of Du Page County granting summary judgment in favor of defendants-insurers, American Motorists Insurance Company, Century Indemnity Company & Indemnity  Insurance Company of North America, and St. Paul Surplus Lines Insurance Company (collectively, insurers).  The trial court determined that the advertiser's coverage part of the "Media Special Perils" policies issued to McDonald's by insurers did not require insurers to indemnify McDonald's in the settlement of an underlying federal lawsuit alleging, 
inter alia
, violation of the Illinois Trade Secrets Act (765 ILCS 1065/1 
et seq.
 (West 1994)).  McDonald's also appeals from a trial court order denying its motion to compel discovery, an issue we discuss in the nonpublished portion of this opinion.  We affirm.

I.  BACKGROUND

The parties are already familiar with the long and complex factual background of this case.  Accordingly, we recite only those facts necessary for an understanding of the issues raised on appeal.

At the time of the events giving rise to the underlying federal litigation, McDonald's was a named insured under the advertiser's coverage part of a "Media Special Perils" (MSP) policy issued by First National Insurance Company of America (Safeco).  To secure additional protection, McDonald's also purchased excess insurance from insurers, with defendant-insurer American Motorists Insurance Company (AMICO) being the lead umbrella carrier.  The purpose of the MSP policies was to insure McDonald’s against the cost of defending lawsuits arising out of its advertising, publicity, or promotional activities and to indemnify McDonald's for the adverse judgments that may result from any such lawsuits.  The AMICO policies contained "broad as primary" endorsements.  The "broad as primary" endorsements provided that AMICO agreed to be bound by the terms of the underlying primary policy, notwithstanding any more restrictive terms in the excess policy.  The AMICO policy listed Safeco as the primary carrier for the MSP policy.  The remainder of the excess insurance policies indicated that they "follow form" to the AMICO policy.  In other words, coverage under the excess carriers was also provided on the same terms as the Safeco policy and was to be implicated once the underlying layers of coverage were exhausted.  The instant dispute concerns the excess insurance policies.  Safeco is not a party to this appeal.

On February 7, 1997, McDonald's filed a complaint against insurers in the circuit court of Du Page County.  The second amended complaint consisted of six counts.  Relevant here are those counts in which McDonald's sought a declaration that insurers were required to indemnify it for the settlement of a complaint filed in federal court and captioned as 
Thermodyne Food Service Products, Inc. v. McDonald's Corp.
, originally filed as No. 95 CV 0232 (D. Ind.), later transferred and redocketed as No. 95 C 6747 (N.D. Ill.) (
Thermodyne
 litigation).

The 
Thermodyne
 litigation stemmed from the development of a product known as the "Thermodyne" oven.  The appeal of this product to McDonald’s was its ability to heat frozen food to serving temperature and hold it for extended periods of time without affecting the quality or taste of the food.  The technology used in the Thermodyne oven was developed principally by an engineer named Benno Liebermann.  Liebermann developed this technology while he was the owner of a company called Advanced Food Technology, Inc. (AFTEC).  Eventually, Vincent Tippman purchased a majority of the stock in AFTEC and formed Thermodyne Food Service Products, Inc. (Thermodyne).  AFTEC researches and develops food service equipment, which Thermodyne then manufactures and markets.  Liebermann refined the technology used in the Thermodyne oven while working for Tippman.  As part of the purchase agreement for AFTEC, Liebermann executed a five-year employment contract with Tippman, which included a covenant not to compete.  For a period of time, McDonald’s worked with 
Thermodyne and AFTEC in developing products for McDonald's restaurants using the Thermodyne oven.  McDonald’s eventually purchased a Thermodyne oven.  Shortly after the purchase, a representative from McDonald's told Tippman that McDonald's was no longer interested in the Thermodyne oven.

Liebermann eventually became unhappy with his relationship with Tippman and resigned from Thermodyne.  Liebermann began working for Beltec, a partnership between himself and OSI Industries, Inc. (OSI).  OSI was a meat supplier for McDonald's.  Thereafter, Beltec developed a product known as the "Temperfect" oven.  Beltec licensed the right to manufacture the Temperfect oven to Taylor Company (Taylor), a division of Specialty Equipment Companies, Inc. (Specialty Equipment).  Specialty Equipment was one of McDonald’s equipment suppliers.  Taylor began to manufacture the Temperfect oven for McDonald’s use.  Soon thereafter, McDonald’s began developing products prepared using the Temperfect oven.  Once the Temperfect oven was installed in a restaurant, representatives from other companies, including competitors of McDonald’s, visited the restaurant to observe the Temperfect oven in use.  McDonald’s also showcased the Temperfect oven to owner-operators of its restaurants as well as various equipment and food suppliers.  In addition, at McDonald’s request, Taylor developed for distribution a specification sheet and a brochure for the Temperfect oven.  The specification sheet stated that "THE INFORMATION SHOWN ON THIS SPECIFICATION SHEET IS FOR THE EXCLUSIVE USE OF LICENSEES OF McDONALD’S SYSTEMS, INC."

Eventually, Thermodyne and AFTEC (collectively, the 
Thermodyne
 plaintiffs) became aware of the development of the Temperfect oven.  On July 20, 1995, the 
Thermodyne
 plaintiffs initiated their lawsuit in federal district court.  The 
Thermodyne
 plaintiffs claimed that McDonald’s and others misappropriated their trade secret to develop a competing product called the "Temperfect" oven.  The 
Thermodyne
 plaintiffs alleged that McDonald's and the other named defendants "engaged in a course of conduct designed to misappropriate [p]laintiffs' employees, technology, and trade secrets."  The complaint further alleged that "[d]efendants' promotion of the 'Temperfect Oven' exposed [p]laintiffs' trade secrets to the market place."

The 
Thermodyne
 plaintiffs' amended complaint consisted of eight counts, the following six of which were directed against McDonald's.  Count I alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 
et seq.
 (West 1994)).  Count II alleged a violation of the Illinois Trade Secrets Act
.  Count III alleged unfair competition.  Count IV alleged breach of confidence.  Count V alleged interference with contractual relations.  Count VIII alleged conspiracy.  On McDonald's motion, the district court dismissed with prejudice counts I, III, and IV on the basis that they were preempted by the Illinois Trade Secrets Act.  As the litigation progressed, the parties to the 
Thermodyne
 litigation prepared a "Final Pretrial Order" pursuant to Rule 16 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 16).

The 
Thermodyne
 plaintiffs also sought to recover for damages, unjust enrichment, exemplary damages, attorney fees, and a "reasonable royalty for [d]efendants' past or future use of or profits from the sale of [p]laintiffs' trade secret or the application thereof."  In addition, attached to the final pretrial order was a "Statement of Special Damages."  Among other things, the 
Thermodyne
 plaintiffs alleged that they lost between $54.3 million and $97.9 million in lost profits as a result of "Market Opportunity Due To Uncertainty As To Ownership Of The Thermodyne Technology Plus Prejudgment Interest."

Meanwhile, McDonald’s attempted to tender the 
Thermodyne
 litigation to Safeco.  Safeco denied coverage.  However, McDonald’s eventually reached a settlement with Safeco, and the insurer agreed to pay $725,000 of the $850,000 owed on its policy.  Insurers, however, denied coverage, and McDonald’s initiated the instant litigation.  Thereafter, McDonald's settled the 
Thermodyne
 litigation for $25 million.  The entire settlement was paid solely by McDonald's.  At the time of settlement, the only theories pending against McDonald’s with respect to the 
Thermodyne
 litigation were misappropriation of trade secrets (count II), interference with contractual relations (count V), and conspiracy (count VIII).

On December 17, 1998, insurers filed a motion for summary judgment in this insurance coverage litigation.  Insurers argued that they did not have a duty to indemnify McDonald’s in the 
Thermodyne
 litigation.  Insurers explained that the MSP policies required a "causal connection" between the commission of an 
offense covered by the policies (enumerated offense) and the content of McDonald’s promotional activity.  Here, insurers argue, there was no coverage because there was no "causal connection" between the content of McDonald's promotional activity and the commission of an enumerated offense.  The trial court denied insurers’ motion without prejudice, and the parties proceeded with discovery.

On January 5, 2000, insurers filed a renewed motion for summary judgment.  The trial court granted insurers’ motion.  The court concluded that, as a matter of law, there was no "causal connection" between the content of McDonald’s promotional activity and the commission of an enumerated offense.  The trial court found that only count II, misappropriation of trade secrets, could arguably fall within the MSP policies.  However, the court explained that the theft of the trade secret occurred before any promotion commenced.  Accordingly, the promotion could not have caused the misappropriation of trade secrets.  Thus, the court concluded that this offense was not committed "within the four corners of the promotion."  McDonald’s now appeals.

II. ANALYSIS

As a preliminary matter, we address the insurers' joint motion to strike from McDonald's opening brief "irrelevant and inadmissible material regarding the non-party primary insurance carrier's settlement."  We ordered the motion as well as McDonald's objections thereto taken with the case. After careful consideration, we now deny insurers' motion.

A.  Duty to Indemnify

McDonald's argues that the trial court erred in granting insurers' renewed motion for summary judgment.  According to McDonald's, while the trial court correctly began its analysis by examining the 
Thermodyne
 plaintiffs' amended complaint, it was required to examine also the
 final pretrial order to determine exactly what transpired in the 
Thermodyne
 litigation.  Looking beyond the labels of the amended complaint, McDonald's asserts, reveals that the 
Thermodyne
 plaintiffs' most significant claim against McDonald's is a claim for 
"cloud on title."  According to McDonald's, this theory implicates the 
Thermodyne
 plaintiffs' allegations that McDonald's had "misled the market into believing that Tippman was not the rightful owner of the technology in the Thermodyne oven by promoting the Temperfect oven as incorporating technology that was owned exclusively by McDonald's."  McDonald's contends that the "cloud on title" theory arose directly out of its promotion of the Temperfect oven.  McDonald's further maintains that this "cloud on title" theory was actionable as an "unfair competition" claim or a "slander of title" claim.  

Insurers respond that the trial court properly granted their renewed motion for summary judgment.  Examining the causes of action actually asserted by the 
Thermodyne
 plaintiffs reveals that there is no causal connection between the acquisition and use of technological trade secrets 
and McDonald's promotion of the Temperfect oven.  McDonald's attempt to assert that the 
Thermodyne
 plaintiffs pursued a "cloud on title" theory is flawed because the "cloud on title" theory was a damages theory, and the plain language of the MSP policies permits coverage only if an 
offense
 is caused by promotion, not if 
damages
 are caused by the promotion. Insurers finally contend that McDonald's improperly attempts to recast the 
Thermodyne
 litigation as one involving unfair competition or slander of tile.

In appeals from summary judgment rulings, this court conducts a 
de novo
 review.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 
Ill. 2d
 90, 102 (1992).  Summary judgment is a drastic measure and should be granted only if the movant's right to judgment is clear and free from doubt.  
Missouri Pacific R.R. Co. v. American Re-Insurance Co.
, 286 
Ill. App. 3d
 129, 133 (1996)
.
  Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  
International Insurance Co. v. Rollprint Packaging Products, Inc.
, 312 
Ill. App. 3d
 998, 1007 (2000).  A reviewing court may affirm a trial court's ruling granting summary judgment on any grounds that appear in the record, regardless of whether the trial court relied on them.  
International Insurance Co.
, 312 
Ill. App. 3d
 at 1007.  We further note that the construction of an insurance contract is a question of law, and an interpretation of an insurance contract provision is appropriate on a motion for summary judgment. 
International Insurance Co.
, 312 
Ill. App. 3d
 at 1007.

This case involves whether insurers had a duty to indemnify McDonald's in the settlement of the 
Thermodyne
 litigation.  The duty to indemnify is much narrower than the duty to defend.  
Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons
, 315 
Ill. App. 3d
 552, 559 (2000).  Unlike the duty to defend, the duty to indemnify cannot be determined simply on the basis of whether the factual allegations of the underlying complaint potentially state a claim against the insurer.  
Waste Management, Inc. v. International Surplus Lines Insurance Co.
, 144 
Ill. 2d
 178, 203 (1991) (supplemental opinion on denial of rehearing).  The duty to indemnify arises only when the facts alleged 
actually
 fall within the coverage of the policy at issue.  
Crum & Forster Managers Corp. v. Resolution Trust Corp.
, 156 
Ill. 2d
 384, 398 (1993).

In accordance with the above principles, we must analyze the underlying complaint in light of the applicable policy provisions to determine whether the complaint actually falls within the coverage of the policy at issue.  In federal litigation, the final pretrial order supercedes the complaint.  See, 
e.g.
, 
Ash v. Wallenmeyer
, 879 F.2d 272, 274 (7th
 Cir. 1989) (noting that the effect of the pretrial order is to supersede the pleadings); 
Ghandi v. Police Department
, 823 F.2d 959, 962 (6th
 Cir. 1987) (same); 
Hoagburg v. Harrah's Marina Hotel Casino
, 585 F. Supp. 1167, 1175 (D. N.J. 1984) (same).
  Therefore, in addition to examining the allegations of the underlying complaint, we will consider also the allegations as set forth in the final pretrial order.  Moreover, we note that, at the time McDonald's settled the 
Thermodyne
 litigation, three counts were pending against it.  Of those three counts, only count II, violation of the Illinois Trade Secrets Act, is implicated here.

Our analysis necessarily begins with the language of the insurance policies in dispute.  Pursuant to the advertiser's coverage part of the MSP policies issued to McDonald’s, insurers agreed:

"[t]o pay on behalf of the 
insured
 all 
loss
 and 
claim expense
 which the 
insured
 shall become legally obligated to pay because of liability imposed by law or 
assumed under contract
 as a result of one or more 
claims
 arising out of:

any form of defamation or other tort related to disparagement or harm to the character, reputation or feelings of any natural person or organization, including but not limited to libel, slander, product disparagement, trade libel, infliction of emotional distress, outrage or outrageous conduct;

any form of invasion, infringement or interference with rights of privacy or publicity, including but not limited to false light, public disclosure of private facts, intrusion and commercial appropriation of name or likeness;

[i]nfringement of copyright, title, slogan, trademark, trade name, trade dress, service mark, service name, trade identity or patent[;]

plagiarism, piracy, or misappropriation of ideas under implied contract;

[u]nfair competition, including, but not limited to, dilution, deceptive trade practices, civil actions for consumer fraud, false advertising or misrepresentation in advertising, and claims under Section 43 (a) of the Lanham Act or similar state statutes;

committed in the utterance or dissemination of 
matter
 arising out of an 
occurrence
 during the policy term, regardless of when 
claim
 is made or suit is brought." 

The policies define "matter" as:

"the content of advertising, publicity or promotion in any form including, but not limited to, the artistic, literary, printed, pictorial, statistical, musical, audio, audio-visual or dramatic content of such advertising, publicity or promotional material, and use of such matter by others with the permission of the Named Insured."

The policies define "occurrence" as:

"the broadcast, telecast, cablecast, publication, distribution, display, or exhibition of 
advertising
 material, promotional material or publicity material by or within the permission of the 
Named Insured
 on its own behalf."

Thus, insurers have a duty to indemnify McDonald’s if (1) the 
Thermodyne
 plaintiffs were pursuing one of the offenses enumerated in the policy; (2) the enumerated offense was committed in the content of advertising, publicity or promotion; and (3) the enumerated offense arose out of the publication of advertising, publicity, or promotional material.

McDonald's argues that the trial court erred in granting insurers' renewed motion for summary judgment.  According to McDonald's, separate and apart from the 
Thermodyne
 plaintiffs' allegations of misappropriation and use of trade secrets was their claim for "cloud on title."  McDonald's claims that it settled the 
Thermodyne
 litigation "because it feared being hit with a runaway verdict for a claim *** for the cloud that its promotional activities had allegedly cast on [Tippman's] title to the technology incorporated in the Thermodyne oven."  From this statement, McDonald's suggests that the 
Thermodyne
 plaintiffs' claim for "cloud on title" was more than a theory of consequential damages.  Looking beyond labels, McDonald's insists, reveals that the "cloud on title" claim was independently actionable as a claim for slander of title or unfair competition.  McDonald's contends that under either of these theories there is a direct causal connection between the content of McDonald's promotion of the Temperfect oven 
and the commission of an enumerated offense.

Insurers disagree.  Insurers claim that, even if the "misappropriation of trade secrets" cause of action constitutes an enumerated offense for purposes of the MSP policies, McDonald's is not entitled to coverage because there is no causal connection between McDonald's promotional activities and the misappropriation and use of the 
Thermodyne
 plaintiffs' trade secrets.  Insurers argue that, because McDonald's is unable to establish a causal connection between its promotional activities and the "misappropriation of trade secrets" cause of action in the 
Thermodyne
 litigation, McDonald's improperly attempts to obtain coverage under the MSP polices by recasting the 
Thermodyne
 litigation as a lawsuit for "slander on title" or "unfair competition" claims.  However, insurers argue that neither the 
Thermodyne
 plaintiffs' underlying complaint nor the final pretrial order includes causes of action for unfair competition or slander of title.  Moreover, insurers maintain, such causes of action would be legally impossible to bring under the circumstances.  In any event, the "cloud on title" theory upon which these two claims are based is solely a measure of damages flowing from the causes of action asserted against McDonald's.  Consequently, McDonald's cannot meet the direct causal connection requirement because said requirement requires that the offense be caused by the promotion, not merely the damages.

We conclude that insurers were entitled to summary judgment because neither the allegations in the 
Thermodyne
 plaintiffs' amended complaint nor those in the pretrial order actually fall within the coverage of the policy.  None of the allegations contained in these two pleadings constitute an enumerated offense.  In any event, the "cloud on title" theory was a damages theory, outside the reach of the coverage of the policy.  Even assuming that the allegations of misappropriation of trade secrets constitutes an enumerated offense, McDonald's is unable to demonstrate that the misappropriation of trade secrets was caused by its promotional activities.

Several courts have already determined that claims of trade secret misappropriation do not satisfy the causal connection requirement of "advertising injury" policy language similar to the MSP policy here.  See, 
e.g.
, 
Simply Fresh Fruit, Inc. v. Continental Insurance Co.
, 94 F.3d 1219 (9th
 Cir. 1996); 
Winklevoss Consultants, Inc. v. Federal Insurance Co.
, 991 F. Supp. 1024 (N.D. Ill. 1998).  Realizing this, McDonald's argues that separate and apart from the misappropriation of trade secrets allegations, the 
Thermodyne
 plaintiffs also asserted a claim for "cloud on title."

The 
Thermodyne
 plaintiffs' amended complaint contains the following allegations:

"3.  By way of introduction and synopsis, [p]laintiffs' assert that [d]efendants have engaged in a course of conduct designed to misappropriate [p]laintiffs' employees, technology, and trade secrets. *** [A]nd, [d]efendants' promotion of the 'Temperfect Oven' exposed [p]laintiffs' trade secrets to the market place."

The complaint also asserted: 

"62.  Plaintiffs are entitled to recover their damages, any unjust enrichment to [d]efendants, exemplary damages, and attorneys' fees pursuant to 765 ILCS 1065/4-5.

63.  Additionally, [p]laintiffs are entitled to a reasonable royalty for [d]efendants' past or future use of or profits from the sale of [p]laintiffs' trade secret or the application thereof."

As refined in the 
Thermodyne
 plaintiffs' brief submitted with the final pretrial order, the 
Thermodyne
 plaintiffs posited their theory of liability against McDonald's for misappropriation of trade secrets as follows:

"McDonald's improperly acquired the Plaintiffs' trade secrets by representing to the Plaintiffs that it had an interest in viewing and testing Plaintiffs' Thermodyne oven and other systems in order to determine whether it would agree to purchase these ovens and other systems from the Plaintiffs for use in McDonald's restaurants or approve their use in its licensees' restaurants.  McDonald's recognized the value and revolutionary potential of the Thermodyne to the fast food industry and conspired with [OSI] to misappropriate control over its future use and development.

In April, [
sic
] 1990, OSI, in collusion with McDonald's, entered into a partnership with Liebermann, Plaintiffs' key researcher and developer, to develop the Plaintiffs' technology and hired Liebermann as an employee of the partnership.  Then, after test marketing various products using the Plaintiffs' ovens, McDonald's insisted on purchasing an oven from the Plaintiffs on June 6, 1990, executed a Confidentiality Agreement for Liebermann personally on June 7, 1990, and then 5 days later informed the Plaintiffs' [
sic
] that it was putting the testing of Plaintiffs' ovens on hold.  McDonald's immediately began working with OSI and Taylor to develop and manufacture an oven based on the Plaintiffs' technology.  Following the execution of a Partnership Agreement on July 24, 1990, the partnership (Beltec) entered into a licensing agreement with Taylor for the manufacture of ovens based on Plaintiffs' technology to be sold to McDonald's.  Also on July 24, 1990, Liebermann entered into a written Employment Agreement with Beltec, having resigned from AFTEC on July 18, 1990, breaching his contract with AFTEC.  The first prototype Temperfect ovens manufactured later contained more modifications of the various interconnecting Thermodyne systems and component parts.  McDonald's purchased the ovens manufactured by Taylor under license from Beltec and used the ovens in its restaurants and continues to do so."

Also part of the final pretrial order was a statement of special damages, including damages for lost profits "as a result of reduction of market opportunity due to uncertainty as to ownership of the Thermodyne technology."

Based on our review of the record, including the 
Thermodyne
 plaintiffs' amended complaint and the final pretrial order, we are unpersuaded by McDonald's argument that the 
Thermodyne
 plaintiffs stated a cause of action for "cloud on title."  McDonald's has not cited any cases recognizing such a cause of action in Illinois.  Moreover, our independent research has not found any case in which a court in this state has recognized such a cause of action.  
Cf
. 
American National Bank & Trust Co. v. Bentley Builders, Inc.
, 308 
Ill. App. 3d
 246, 252 (1999) (noting that the act of maliciously recording a document that clouds one's title to real estate is actionable as slander of title); 
Lakeview Trust & Savings Bank v. Estrada
, 134 
Ill. App. 3d
 792, 811 (1985) (explaining that an action to quiet title in property is an equitable proceeding in which a party seeks to remove a cloud upon his title to the property).  We will not strain to locate a cause of action that does not exist.  See, 
e.g.
, 
Bart v. Board of Education
, 256 
Ill. App. 3d
 880, 886 (1993) (noting that, although article I, section 12, of the Illinois Constitution (Ill. Const. 1970, art. I, §12) provides that "[e]very person shall find a certain remedy in the laws for all injuries and wrongs," the court is not required to create a cause of action where none exists).  We decline McDonald's invitation to create a cause of action for "cloud on title."

Even if Illinois recognized a cause of action for "cloud on title," McDonald's argument is still unpersuasive.  Coverage under the MSP policy is available only if the enumerated 
offense
 arose out of the publication of the advertising, publicity, or promotional material.  The 
Thermodyne
 plaintiffs did not explicitly state a cause of action for "cloud on title" in their amended complaint.  Going past the labels of the complaint, as McDonald's urges us to do, does not persuade us otherwise.  We do not read the allegations made by the 
Thermodyne
 plaintiffs in either their underlying complaint or the final pretrial order as stating a cause of action for "cloud on title."

As we discuss above, the final pretrial order does request special damages for lost profits as a result of "reduction of market opportunity due to uncertainty of ownership."  McDonald's also cites to several places in the record regarding testimony in relation to the so-called "cloud on title" theory.
  
However, even reading these allegations in a light most favorable to McDonald's, as we must (see 
Purtill v. Hess
, 111 
Ill. 2d
 229, 240 (1986)), we interpret the "cloud on title" theory as a measure of damages arising out of the 
Thermodyne
 plaintiffs' allegations that McDonald's misappropriated its trade secret.  Indeed, a valid cause of action does not exist unless the plaintiff suffers both 
injury
 and 
damages
.  
Stathis v. First Arlington National Bank
, 226 
Ill. App. 3d
 47, 54 (1992).  The "cloud on title" theory appears in the final pretrial order only as a measure of 
damages
 from the causes of action asserted by the 
Thermodyne
 plaintiffs against McDonald's.  The references in the record to which McDonald's cites in support of its theory do not convince us that the "cloud on title" theory was a separate claim apart from the allegations of misappropriation of trade secrets.  Rather, we interpret these passages as a request for damages arising out of the misappropriation of the Thermodyne technology.   Indeed, the Illinois Trade Secrets Act (765 ILCS 1065/1 
et seq.
 (West 1994)), upon which the 
Thermodyne
 plaintiffs' "misappropriation of trade secret" complaint was premised, specifically permits the individual aggrieved to collect these types of damages.  The statute provides:

    "[A] person is entitled to recover damages for misappropriation.  Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  If neither damages nor unjust enrichment caused by the misappropriation are proved by a preponderance of the evidence, the court may award damages caused by misappropriation measured in terms of a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."  765 ILCS 1065/4 (West 1994).

The 
Thermodyne
 plaintiffs' request for damages was a response to the statute.

McDonald's argument fails, then, because coverage is available under the MSP policies only if there is a direct causal connection between McDonald's promotional activities and an enumerated offense.  The MSP policies do not afford coverage if the only causal connection is between an insured's promotional activities and the measure of damages asserted by an underlying plaintiff.  In addition, as the insurers point out, if McDonald's view of the MSP policy language were adopted, "coverage would extend to virtually every misappropriation of trade secrets case since the product or equipment that is developed from wrongfully acquired trade secrets is typically advertised after the fact."  

An argument similar to the one raised by McDonald's was considered in 
Winklevoss Consultants, Inc. v. Federal Insurance Co.
, 991 F. Supp. 1024 (N.D. Ill. 1998).  In 
Winklevoss
, the underlying plaintiff sued the insured, alleging, 
inter alia
, misappropriation of a trade secret in violation of the Illinois Trade Secrets Act.  The underlying plaintiff's complaint alleged that the insured began marketing the misappropriated trade secret to the underlying plaintiff's existing and potential customers.  Accordingly, the underlying plaintiff sought several types of damages, including damages for lost revenue, profits, and customers.  The insured had purchased comprehensive general liability policies containing "advertising injury" coverage.  The insured tendered its defense to the insurer.  The insurer refused to defend the insured in the underlying suit.  The insured then sought a declaratory judgment that the insurer had a duty to defend it against a suit alleging violations of the Illinois Trade Secret Act.

On the parties' cross-motions for summary judgment, the district court granted the insurer's motion.  
Winklevoss
, 991 F. Supp. at 1029.  The court rejected the insured's argument that the trade secret violations were committed in the course of advertising, as required by the insurance policy.  
Winklevoss
, 991 F. Supp. at 1033.  The court assumed, for purposes of discussion, that the misappropriation of a trade secret was a covered offense under the "advertising injury" provision of the insured's policy.  
Winklevoss
, 991 F. Supp. at 1033.  Nevertheless, the court concluded, there was no causal connection between the insured's promotional activity and the alleged misappropriation of trade secrets.  
Winklevoss
, 991 F. Supp. at 1033.  The court explained that the allegations of trade secret misappropriation took place long before any efforts to promote the competing product developed by the insured.  
Winklevoss
, 991 F. Supp. at 1033.

In 
Winklevoss
, the insured also argued that "its promotional activities caused [the underlying plaintiff] harm--lost revenue, profits, and customers--satisfying the advertising injury requirement."  
Winklevoss
, 991 F. Supp. at 1035.  Likewise, the court rejected this argument on the basis that the insured "fail[ed] to tie advertising activities to a covered offense."  
Winklevoss
, 991 F. Supp. at 1035.  The court further elaborated:

"First, what [the insured] portrays as injuries did not '[arise] solely out of' a covered offense 'committed in the course of advertising your goods, products, and services,' as [the insurer's] policy requires.  To the extent [the underlying plaintiff's] profit, revenue, and customer losses arose solely out of [the insured's] trade secret misappropriation ***, the misappropriation was not *** committed 'in the course of advertising.' " 
Winklevoss
, 991 F. Supp. at 1035.

Likewise, in this case, McDonald's fails to tie any promotional activity to an enumerated offense.  The money lost due to "cloud on title," 
i.e.
, uncertainty as to market place, arose out of McDonald's "trade secret misappropriation" claim.  The trial court properly ruled that this cause of action was not committed in the course of McDonald's advertising, publicity, or promotional materials.

In anticipation of our holding that Illinois does not recognize a cause of action for "cloud on title."  McDonald's attempts to categorize the "cloud on title" theory as one for "unfair competition" or "slander of title."  Both arguments fail.

An examination of the 
Thermodyne
 plaintiffs' amended complaint and the final pretrial order demonstrates that neither of these causes of action is explicitly or implicitly included
.  Insurers argue that, in any event, it was impossible for the 
Thermodyne
 plaintiffs to bring causes of action for slander of title or unfair competition.  We agree.

We first address McDonald's argument that the 
Thermodyne
 plaintiffs' alleged claim for "cloud on title" was actionable as unfair competition.  The 
Thermodyne
 plaintiffs originally asserted a cause of action for unfair competition as count III of their amended complaint.  The district court granted McDonald's motion to dismiss count III, finding:

"Count II is a claim made under the Illinois Trade Secrets Act [citation].  The Act explicitly states that it 'is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this state providing remedies for misappropriation of a trade secret.'  765 ILCS 1065/8(a).  Furthermore, the Seventh Circuit has interpreted this provision of the Act to express Illinois' willingness to abolish all common law theories of misuse of secret information. [Citation.]  
In Counts III and IV of their amended complaint, plaintiffs allege common law claims for unfair competition and breach of confidence premised upon allegations of wrongful use of plaintiffs' confidential information.  Because the court holds these claims to be preempted by the language set forth above in the Illinois Trade Secrets Act, Counts III and IV of the amended complaint are dismissed with prejudice."

McDonald's now claims that, despite the district judge's ruling, there remains a claim for unfair competition.  McDonald's argument, however, is barred by the doctrine of judicial estoppel.

The doctrine of judicial estoppel provides that when a party assumes a certain position in a legal proceeding, that party is estopped from assuming a contrary position in a subsequent legal proceeding.  
People v. Lawlor
, 291 
Ill. App. 3d
 97, 103 (1997).  For the doctrine to apply, (1) the party must have taken two positions, (2) the positions must have been taken in separate judicial proceedings, (3) the party must have intended the trier of fact to accept the truth of the facts alleged in support of the position, (4) the party must have succeeded in asserting the first position and received some benefit from it, and (5) the two positions must be inconsistent.  
Lawlor
, 291 
Ill. App. 3d
 at 103.  The doctrine was developed to promote the truth and to prevent parties from deliberately shifting positions in separate legal proceedings.  
Giannini v. First National Bank
, 136 
Ill. App. 3d
 971, 983 (1985).

In this case, all of the elements of judicial estoppel are present.  
First, McDonald's has taken two contrary positions.  In the 
Thermodyne
 litigation, it successfully moved to have the underlying plaintiffs' cause of action for unfair competition dismissed for preemption.  In this insurance coverage dispute, McDonald's argues that a count for unfair competition survived the dismissal.  Second, McDonald's positions were taken in separate judicial proceedings.  Third, there is no dispute that McDonald's intended the judge in the 
Thermodyne
 litigation to accept the truth of the facts alleged in support of its position
.  Fourth, McDonald's did not have to defend against an "unfair competition" cause of action.  Thus, it received benefit from requesting the dismissal.  Finally, McDonald's positions are inconsistent.

McDonald's argues, however, that the "cloud on title" theory did not emerge until after the parties had finished briefing McDonald's motion to dismiss the 
Thermodyne
 plaintiffs' unfair competition claim.  Thus, McDonald's reasons, the district court judge could not have intended to dismiss an "unfair competition" claim premised on "cloud on title."  However, during oral argument on the insurers' renewed motion for summary judgment in this insurance coverage dispute, McDonald's admitted that the "cloud on title" theory, however inarticulate, was a theory developed by Tippman at the beginning of the case.  More specifically, McDonald's attorney stated:

"[Plaintiff's damages expert], although he's not a lawyer, didn't come up with this theory.  Mr. Tippman had this theory.  Mr. Tippman testified that he had this theory at the beginning of the case.  That [plaintiff's damages expert] articulated for everybody and sort of brought it out into the open so that McDonald's would realize what was coming, what was coming undone.  It wasn't particularly well articulated before."

Accordingly, McDonald's cannot now claim that this theory did not emerge until after the parties briefed this issue for the district court. 

McDonald's also asserts that the district court judge's dismissal order was limited to unfair competition claims predicated on the use of "confidential information."  McDonald's argues that the instant "cloud on title" claim is predicated on "other types of 'unfair competition' not implicating the misuse of 'confidential information.' " McDonald's argument is unpersuasive.  As we discussed, at the time that McDonald's moved to dismiss the 
Thermodyne
 plaintiffs' unfair competition claim, it was aware of the so-called "cloud on title" claim.  Thus, McDonald's position that its motion did not encompass all possible "unfair competition" claims is untenable.

Also unsuccessful is McDonald's attempt to shoehorn its "cloud on title" theory into a claim actionable as slander on title.  "Slander of title" is
 the false and malicious publication, oral or written, of words which disparage an individual's title to property resulting in special damages.  
Ringier America, Inc.  v. Enviro-Technics, Ltd.
, 284 
Ill. App. 3d
 1102, 1104-05 (1996).  "Slander of title" claims usually arise in the context of real property (see 
Ringier America
, 284 
Ill. App. 3d
 1102; 
La Salle National Bank v. Kissane
, 163 
Ill. App. 3d
 534 (1987)).  However, as McDonald's correctly notes, the tort has been expanded to encompass other types of ownership interests.  See, 
e.g.
, 
Reliable Manufacturing Co. v. Vaughan Novelty Manufacturing Co.
, 294 
Ill. App. 
601 (1938)(recognizing cause of action for slander of title with respect to patent for a can opener).  However, McDonald's does not cite to a case recognizing a cause of action for slander of title premised on a violation of the Illinois Trade Secrets Act.  Moreover, our independent research has not located such a case.

Nevertheless, McDonald's notes that section 624 of the Restatement (Second) of Torts provides that slander of title extends to "[a]ny kind of legally protected interest in land, chattels or intangible things *** if the interest is transferable and therefore salable or otherwise capable of profitable disposal.  It may be a patent right, a copyright or the right to use a trademark or trade name."  Restatement (Second) of Torts §624, at 344 (1977).  Although it does not purport to be a complete catalog of legally protected interests, the Restatement does not mention misappropriation of trade secrets.  Restatement (Second) of Torts §624, at 344 (1977).

We need not decide whether one may possess title to a trade secret.  McDonald's allegations cannot survive because there is no explicit or implicit allegation that the content of McDonald's promotion contained a 
false
 misrepresentation.  The 
Thermodyne
 plaintiffs' amended complaint alleges that "Defendants' promotion of the 'Temperfect Oven' exposed Plaintiffs' trade secrets to the market place."  The special damages provision of the final pretrial order speaks of "Lost Profits *** As A Result of Market Opportunity due to Uncertainty As To Ownership of the Thermodyne Technology."  These statements merely relate to confusion over the proper owner of the Thermodyne technology.  These allegations do not claim that McDonald's statements were false.

In support of its claim, McDonald's cites to 
Pendleton v. Time, Inc.
, 339 Ill. App. 188 (1949).  In 
Pendleton
, the plaintiff appealed the dismissal of his complaint against the defendant, Time, Inc.  The plaintiff was an artist who had painted the first portrait of Harry S. Truman.  The plaintiff sued the defendant for publishing a later portrait of Truman with the caption, "President sits for first portrait and considers result flattering."  The article accompanying the portrait elaborated, " ' "During all his years in public life Harry Truman never bothered to have his portrait painted.  Recently, however, as President, he sat for Artist Jay Wesley Jacobs.  The result, Truman's first portrait, is shown here." ' " 
Pendleton
, 339 Ill. App. at 192.  The plaintiff alleged that the defendant, knowing the aforementioned statements to be false, nevertheless "knowingly and maliciously published" the article with the " ' intent to injure the plaintiff and to detract and destroy his reputation as an artist.' "  (Emphasis omitted.)  
Pendlelton
, 339 Ill. App. at 193.  The plaintiff further alleged that, as a direct consequence of the publication of these false statements, he " 'lost all benefit and advantage accruing to him by reason of his having made and executed the first portrait of said Harry S. Truman.' " 
Pendleton
, 339 Ill App. at 193.  The Plaintiff also alleged that the defendant's statements made the defendant appear to have said an untruth and that the plaintiff's rights of reproduction of his portrait had been lessened and rendered of little or no value.  The appellate court reversed.  
Pendleton
, 339 Ill. App. at 196.

McDonald's reliance on 
Pendleton
 is misplaced.  First, as insurers point out, it is unclear whether the 
Pendleton
 plaintiff was asserting a cause of action for slander of title because the court never explicitly mentions that cause of action.  On a more fundamental level, 
Pendleton
 is distinguishable because it did not involve a trade secret.  The  plaintiff in 
Pendleton
 was seeking to protect his claim as the first artist to depict Harry Truman in a portrait.  Further, the statement made by the defendant in 
Pendleton
 was a false statement because only one person could paint the first portrait of Truman. 

McDonald's insists that summary judgment was improper at this state of the litigation because it could reasonably anticipate liability for a covered claim.  See, 
e.g.
, 
Illinois Tool Works, Inc. v. Home Indemnity Co.
, 24 F. Supp. 2d 851, 854 (N.D. Ill. 1998) (applying Illinois law).  We are unpersuaded by McDonald's argument, however, because McDonald's could not reasonably anticipate coverage for a cause of action that does not exist or that was legally impossible to bring under the circumstances.

B.  Discovery Issue

This issue is discussed in the nonpublished portion of this opinion.

[Nonpublishable material under Supreme Court Rule 23 omitted here.] 

III. CONCLUSION

For the aforementioned reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

RAPP and CALLUM, JJ., concur.