**PERDUE FARMS INCORPORATED**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A., et al.**

**No. CIV. L–99–2818.**

United States District Court,
D. Maryland.

April 8, 2002.

Neil J. Dilloff, Francis B. Burch, Jr., Glen Keith Allen, Piper Rudnick LLP, Baltimore, MD, Stephen R. Mysliwiec, Piper, Rudnick LLP, Washington, DC, for Plaintiff.

M. Elizabeth Medaglia, Robert N. Kelly, Barbara M. R. Marvin, Jackson and Campbell PC, Washington, DC, Bruce Kenneth Trauben, Dorsey and Whitney LLP, Washington, DC, for National Union Fire Insurance Co. of Pittsburgh.

Jeffrey R. Schmieler, Lucas Farinato Webster, Alan Burton Neurick, Saunders and Schmieler PC, Silver Spring, MD, for Federal Insurance Co.

George L. Huber, Jr., Michael Sean De-Baugh, Lord and Whip PA, Baltimore, MD, for American National Ins. Co.

## MEMORANDUM

LEGG, District Judge.

This Court is asked to decide whether a multi-million dollar jury verdict against Perdue Farms Incorporated ("Perdue") is covered by the "Advertising Liability" provisions of the insurance policies issued to Perdue by Defendants. Because the Court concludes that the verdict is not covered, summary judgment will be entered against Perdue on the coverage issues.

In 1997, inventor Dennis Hook filed suit against Perdue in Florida state court. *Hook, et al. v. Pizza Hut, Inc. and Perdue Farms Incorporated,* Case No. 97–1086 (Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida)("*Hook I* ") Hook alleged that, prior to 1991, he developed a proprietary process for preparing, storing, and reheating rotisserie style chicken.[1] Under Hook's process, chicken pieces are seasoned, cooked in a vacuum-sealed bag, then refrigerated, but not frozen. Because the chicken is pre-cooked, it can be handled more easily and safely than raw chicken. The chicken parts can be stored unfrozen for up to nine weeks. The pieces are "rethermalized" in two steps, first microwaving the chicken in the bag (to steep the meat in its seasoned juices) and then "browning" it in a deep fryer or an oven. The principal advantage of this process is that a fast-food restaurant can prepare and serve rotisserie-style chicken in less than ten minutes.

Hook sought to license his process to quick service restaurants. In 1992, Pizza Hut agreed to test market the process and brought in Perdue, a major poultry company, as a potential supplier. Later, Hook made similar agreements with two of Pizza Hut's corporate affiliates, Kentucky Fried Chicken and Pepsico Restaurants International.[2] The jury found that Perdue subjected itself to two confidentiality agreements under which Perdue agreed neither to use nor disclose the process without Hook's permission. The two agreements are referred to by the parties as the "Pizza Hut Confidentiality Agreement" and the "Perdue Confidentiality Agreement."

In April, 1993, Hook traveled to Perdue's plant and orally described his method to Perdue personnel. In July, 1994, Pizza Hut decided to cancel the test marketing, which was code-named, "Project Feathers." In September, 1994, Pizza

---

1. Dennis Hook, the sole shareholder of H & N Foods, Inc., is deceased.

2. Pepsico Restaurant International is the parent company of Pizza Hut, Kentucky Fried Chicken, and Taco Bell. Pizza Hut was to test market the process. If the process had been successful, it would have been made available to quick service restaurants throughout the Pepsico chain.

Hut's sister corporation, KFC, also decided to terminate its evaluation of the Hook process, which was code named, "Project Quaile."

In 1996, Hook attended a trade show in Paris, where he saw a display for a new Perdue chicken product called, "Tender-Ready." Hook read the sales brochures and other literature, which described TenderReady as a fresh new way for food service operators to serve roasted chicken. The literature described the product as pre-cooked, pre-seasoned, vacuum packed chicken pieces that could be quickly reheated. Perdue initiated the Tender-Ready project, which was initially called, "Project 486," on October 29, 1993, shortly after Hook's visit to Perdue's plant.

Hook demanded that Pizza Hut either require its erstwhile supplier, Perdue, to stop using the process or pay Hook royalties. Perdue rejected Hook's demands, contending that Hook's process was not original, but was merely cobbled together from methods well known in the industry. In 1997, Hook filed suit against Pizza Hut and Perdue in Florida state court.

After Pizza Hut settled, the suit proceeded to a jury trial on a three count Complaint.[3] In Count I, Hook contended that Perdue had misappropriated his trade secret in violation of the Florida Uniform Trade Secret Act, § 688, Florida Statutes (1995). Counts II and III alleged that Perdue, by using and disclosing the process, had violated two confidentiality agreements that Hook was entitled to enforce. Perdue defended by arguing that (i) Hook was not entitled to enforce the confidentiality agreements, (ii) Hook's process was not a trade secret, and (iii) Hook had suffered no damages because there was little market for either his process or for TenderReady.

Perdue's lack-of-damage argument was based on Hook's inability to persuade any fast food chains to license his process, and Perdue's own lack of success in selling its TenderReady chicken to fast food chains. While Perdue had sold TenderReady to some institutional customers, such as Sysco, a major food services provider to restaurants and cafeterias, Perdue had found sales disappointing and the product line unprofitable.[4]

Following a three week trial, the Florida jury returned a verdict in Hook's favor on all counts. Answering a special verdict sheet, the jury found that:

1) As to Count I (Florida Uniform Trade Secrets Act), Hook's process was a trade secret, which Perdue had "misappropriated;"

2) As to Count II (Breach of Contract), Perdue had breached the Pizza Hut Confidentiality Agreement, which Hook, as a third-party beneficiary, had standing to enforce;

3) As to Count III (Breach of Contract), Perdue had breached the Perdue Confidentiality Agreement, which Hook, either by assignment or as a party, had standing to enforce; and

4) As to damages under Counts I, II, and III, the jury awarded $25 million in actual damages, and $2 million for unjust enrichment.[5]

---

3. Hook's Complaint originally alleged a claim for equitable accounting, but Hook did not pursue this claim. Hook also alleged claims against Pizza Hut which were dismissed pursuant to a pre-trial settlement agreement between Hook and Pizza Hut.

4. Despite selling over 6,462,789 pounds of TenderReady, Perdue incurred a loss on the product.

5. The verdict form did not ask the jury to break down the damage award on a count-by-count basis. Accordingly, the Court assumes

When asked to state when Hook's damages had "accrued," the jury responded, "Oct. 29, 93," which was the date of an internal memorandum memorializing Perdue's decision to go ahead with the TenderReady project. The jury also found that Perdue's misappropriation was "willful and malicious." In post-trial proceedings, the trial court awarded Hook an additional $6.75 million in statutory damages under the Florida Uniform Trade Secrets Act ("FUTSA") based on the jury's finding of willfulness, and $14.8 million in prejudgment interest calculated back to October 29, 1993. The total damage award added up to $48.65 million.

Perdue appealed to the District Court of Appeal of Florida, Second District. *See Perdue Farms, Inc. v. Hook*, 777 So.2d 1047 (Fla.Dist.Ct.App.2001)("*Hook II*"). While the case was on appeal, Hook and Perdue entered into a "high-low" settlement agreement. Win or lose on appeal, the agreement provided that Perdue would pay Hook at least $10 million, but no more than $30 million.

On January 5, 2001, the Florida District Court of Appeal issued its decision affirming the actual damage and unjust enrichment awards, but reversing the award of punitive damages and pre-judgment interest. Based on the high-low settlement agreement, Perdue paid Hook $30 million, which included the compensatory damage award, the unjust enrichment award, and post-judgment interest.

In 1999, Perdue filed the instant suit against three insurance companies, two of which, National Union Fire Insurance ("National") and Federal Insurance Company ("Federal"), remain. Perdue seeks (i) coverage for the $30 million compensatory damage award, and (ii) recompense from National, which defended on appeal but not during trial, of defense costs.[6]

Perdue claims that coverage exists under the Advertising Liability provision of National's policy for the year 1995.[7] Perdue's argument focuses on the brochures and other advertising literature that it published in 1995, and which Hook discovered at the Paris trade show in 1996. Perdue contends that the literature discloses the details of the process that Hook claims as a trade secret, particularly the key "rethermalization" method for quickly and appetizingly reheating the chicken. "The evidence upon which the jury's verdict was based demonstrates that the jury necessarily found that Perdue damaged Hook through Perdue's disclosure of Hook's process in Perdue's advertisements and publicity articles for TenderReady," Perdue claims. Because Perdue published the advertisements in1995, Perdue concludes that the Advertising Liability provision of the 1995 National and Federal policies covers the Florida damage award.

National and Federal deny coverage. They point to policy language and case law holding that advertising liability coverage is not triggered merely by the advertising of a product developed using misappropriated trade secrets. Instead, advertising liability coverage exists only when the offense giving rise to damages was commit-

that the jury was awarding the same measure of damages under each of the three counts.

**6.** National issued a $15 million commercial liability policy to Perdue covering the period January 1, 1994, to January 1, 1996. Federal issued a $25 million excess liability policy to Perdue covering the period January 1, 1995, to January 1, 1996. Federal is liable for covered damages in excess of National's $15 million limit. Federal's liability is capped at $25 million.

**7.** Federal's is a "follow form" policy, meaning that it provides precisely the same coverage as National's.

ted within the four corners of the advertisement itself. Hook's theory of liability, and the evidence he presented at trial, were based on the argument that Perdue misappropriated the Hook process by developing and marketing TenderReady beginning in 1993, the insurers maintain.

Defendants also point to a policy exclusion stating that the Advertising Liability provision does not cover "claims made against the insured ... for failure of performance of contract." National and Federal argue that this exclusion specifically applies to Counts II and III, both of which alleged breach of contract.[8]

During a scheduling conference, both sides concurred that the coverage questions should be decided on cross-motions for summary judgment. Instead of reopening or relitigating the issues decided in *Hook I*, the Court's analysis should be akin to an archeological excavation. The Court should examine the Florida record, including Hook's Complaint, the *Hook I* transcript, and the decision of the Florida Appellate Court, to determine "whether the basis for [the underlying] judgment is conduct within the policy coverage." *Luppino v. Vigilant Ins. Co.*, 110 Md.App. 372, 677 A.2d 617, 622 (Md.Ct.Spec.App.1996), *aff'd*, 352 Md. 481, 723 A.2d 14 (1999).[9] In other words, the Court is obligated to determine "what was placed before the jury,

and what was necessarily decided by the jury." *Ethicon, Inc. v. Aetna Cas. & Sur. Co.*, 737 F.Supp. 1320, 1331 (S.D.N.Y. 1990). Both sides also agreed that the Court should interpret the policy, apply the policy to the facts, and decide the coverage question as a "matter of law."

The parties engaged in limited discovery to ensure that both sides had the full *Hook I* record in hand. The parties then filed cross-motions for summary judgment, which were extensively briefed and supported by hundreds of pages of the record. The Court conducted five separate hearings, which centered around twenty-seven written questions that the Court submitted to counsel.

Perdue's counsel have done an impressive job of digging through the extensive record for shards of evidence that might be read to support their position. A review of the record, however, admits only one conclusion: the jury found that Perdue misappropriated the Hook process by developing and marketing the TenderReady line of chicken. No reasonable jury could find otherwise.[10] Consistently throughout the litigation, Hook pursued a "preemption" theory of damages, in which he blamed his inability to license his process on the availability of TenderReady in the marketplace. Fast food restaurants, he

---

**8.** In defending the suit, National and Federal have also raised a number of notice and other technical insurance issues. The parties agreed that the Court should decide the coverage and duty to defend issues first. The remaining technical defenses would be litigated only if the Court decided coverage in Perdue's favor.

**9.** *See also, Steyer v. Westvaco Corp.*, 450 F.Supp. 384, 389 (D.Md.1978)(duty to indemnify "turns on comparison of the ultimate findings of fact [in the underlying case] with the policy coverage"); *See e.g., Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 305, 318–319, 753 A.2d 533 (2000).

**10.** Although a jury has been prayed, both sides urged the Court to interpret the policy and decide the coverage question as a matter of law. Counsel had a difficult time articulating under what circumstances a jury might be required to find facts concerning the *Hook I* litigation or the meaning of the policy. The Court will nevertheless analyze the facts under the traditional summary judgment standard. Because the Court concludes that no reasonable jury would find that Perdue's damages are covered under the Advertising Liability provision, the Court will award summary judgment to Defendants.

maintained, would not purchase his proprietary process if they could purchase the end result of that process, TenderReady, from Perdue.

Preemption is the theory articulated in Hook's complaint, it is the theory that Hook's trial counsel repeatedly advocated in opening statement and closing argument, and it is the theory that Hook and his supporting witnesses consistently propounded in their testimony. Three record references convincingly demonstrate that the jury's verdict was based upon their acceptance of the preemption theory:

(i) Perdue's appellate brief unequivocally states that, "Hook's theory of actual damages was that the availability of Perdue's TenderReady product deprived Hook of the ability to earn royalties on his process." Perdue's Appellants Brief, 60;

(ii) the Florida Court of Appeals likewise concluded that, "Hook's theory of liability was that Perdue's TenderReady *product* destroyed his ability to market his process." *Hook II* at 1055. (emphasis added); and

(iii) the jury found on the jury verdict form that Hook's damages accrued as of October 29, 1993, two years prior to the publication of Perdue's advertising.

Accordingly, for the reasons stated herein, the Court will, by separate order, GRANT summary judgment to both National and Federal on the coverage issue, but DENY National's Motion for Summary Judgment on the duty to defend.[11] The Court will, by separate order, set a schedule for additional limited discovery and briefing on the duty to defend.

### The Facts and the Law

The basic facts of the Hook litigation are laid out in *Hook II* and need not be repeated here.

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

The parties agree that Maryland law governs. As stated above, the parties also agree that the Court is to decide the coverage issue as a matter of law on cross-motions for summary judgment. Accordingly, a brief review of relevant insurance law is in order.

It is well-established that Perdue, as the insured, has the burden of proving coverage. *See New Castle County v. Hartford Acc. and Indem. Co.,* 933 F.2d 1162, 1181 (3rd Cir.1991)("It is hornbook law that the insured must demonstrate that the claimed loss is comprehended by the policy's general coverage provisions"). National and Federal have the burden of proving the

---

11. On August 3, 2001, Perdue filed a Motion for Partial Summary Judgment. On September 10, 2001, National and Federal filed Motions for Summary Judgment. On February 14, 19, 22, March 1, and 20, 2002, the Court heard oral arguments on the Motions.

applicability of any exclusions contained in the policy. *Id.*

■■■ Perdue's insurance contract, like any other contract, is to be construed as a whole to effectuate the parties' intentions. *See Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995). The terms of the policy are to be given the meaning that a reasonably prudent layperson[12] would attach to them. *Id.* Words are to be given their customary meaning, unless there is an indication that the parties intended to use them in a technical sense. *Id.* If a reasonably prudent layperson would find a term to be ambiguous, the Court may consult parol evidence. Ambiguity only arises when a reasonably prudent layperson would find a term to be susceptible to more than one meaning. If the meaning of an ambiguous term cannot be determined by analyzing the available parol evidence, the term is to be construed in favor of the insured. *Id.* at 508–509, 667 A.2d 617.

Perdue argues that the factual basis for the *Hook I* judgment is covered under the Advertising Liability provisions of National Union Policy No. BE 309–16–37. The Advertising Liability provision states that:

Advertising Liability shall mean liability for damage because of:

(a) unintentional Libel, Slander or Defamation of Character;

(b) infringement of copyright or title or of slogan;

(c) piracy or unfair competition or idea misappropriation under an implied contract;

(d) invasion of rights of privacy, committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of Named Insured's advertising activities.

*See* Perdue Exhibit # 44. Exclusion H of the insurance policy states that the Advertising Liability provision will not cover "failure of performance of contract." *Id.*

Perdue argues that its 1995 advertisements qualify for coverage as "piracy, unfair competition, and idea misappropriation under an implied contract." These terms are to be interpreted in the context of the surrounding language. *See Curtis–Universal, Inc. v. Sheboygan Emergency Medical Services, Inc., et al.,* 43 F.3d 1119, 1124 (7th Cir.1994)("A word sometimes picks up meaning from its neighbors; and all the other terms in the list of wrongs insured under the rubric of 'advertising injury' concern the misuse of information").[13]

In order for Perdue's liability to be covered by its policy, Perdue must, therefore, establish that the factual basis for the jury's decision was the *disclosure* of the Hook process in the advertising brochures published by Perdue in 1995, and that this disclosure qualifies as one of the offenses enumerated in the Advertising Liability provision. Specifically, Perdue bears the burden of establishing the four following elements:

(i) that it was engaging in advertising activities;

(ii) that liability was premised on an offense enumerated in its policy. In this case, piracy, unfair competition, or idea

---

12. Although it is immaterial to this decision, "a reasonably prudent layperson" refers to a reasonably prudent person in the risk management department of a corporation similar to Perdue.

13. In the Advertising Liability provision, piracy, unfair competition, and idea misappropriation under an implied contract are included among a list of wrongs, each of which is committed within the four corners of the advertisement itself.

misappropriation under an implied contract;

(iii) that the enumerated offense was committed within the four corners of the advertisement; and

(iv) that the commission of the enumerated offense in its advertising activities bears a causal relationship to the damages returned by the jury in *Hook I*.

*See New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1181 (3d Cir.1991).

## ANALYSIS

### Counts II And III, Breach of Contract

Counts II and III of Hook's Complaint alleged breach of the two written confidentiality agreements. These agreements require some additional explanation. After Hook created the process, he enlisted the aid of a friend, George Rice, to help him market it. On April 20, 1992, Hook, Rice, and Rice's company (GDR Food Systems, Inc) entered into a contract with Pizza Hut to co-develop the process for use by Pizza Hut and its affiliates, Kentucky Fried Chicken and Taco Bell. The contact, which the parties refer to as the "Pizza Hut Agreement," required Pizza Hut to keep the process confidential and obtain confidentiality agreements from any third parties with whom Pizza Hut shared the process.

Pizza Hut enlisted Perdue as a potential supplier. On March 30, 1993, pursuant to the Pizza Hut Agreement, Pizza Hut required Perdue to enter into a confidentiality agreement stating that Perdue would neither use nor disclose Hook's process without Hook's permission. The March 30th Agreement is referred to by the parties as the "Pizza Hut Confidentiality Agreement."

On May 11, 1993, Perdue entered into a separate Confidentiality Agreement with GDR. Although Hook signed the agreement, which the parties term the "Perdue Confidentiality Agreement," he was not a named party. Subsequently, GDR assigned to Hook its interest in the Perdue Confidentiality Agreement.

Pursuant to Count II of the Hook Complaint, the jury found that (i) Hook was a third-party beneficiary entitled to enforce the Pizza Hut Confidentiality Agreement, and (ii) that Perdue had "breached" the agreement. Pursuant to Count III of the Hook Complaint, the jury found that (i) Hook was entitled to enforce the Perdue Confidentiality Agreement "as a party, by assignment, or both", and (ii) that Perdue "breached" the agreement.

Perdue argues that Counts II and III are not governed by the "failure of performance of contract" exclusion. First, Perdue maintains that there is a distinction between the "failure to perform" a contract and a "breach of contract." Perdue contends that theirs was a breach of a negative covenant, and not a "failure to perform" a positive covenant.

Second, Perdue argues that Counts II and III are covered under the Advertising Liability provision as an, "idea misappropriation under an implied contract." Because Hook was not a direct party to either of the two confidentiality agreements, the jury may have found that he was entitled to enforce them as a third-party beneficiary or as an assignee. Thus the contracts can be said to have been "implied" under law, Perdue argues.

Based on this characterization of the two confidentiality agreements as implied contracts, Perdue contends that there is a conflict between the grant of coverage for "idea misappropriation under an implied contract" and the exclusion for "failure to perform a contract." Perdue concludes that the exclusion should not be applied to

an offense specifically enumerated by the policy.

The Court finds that the exclusion is fatal as to coverage under Counts II and III. First, no reasonably prudent layman, whether a man off the street or a corporate risk manager, would make the distinction urged by Perdue between either a "breach" and a "failure to perform," or an "affirmative" covenant and a "negative" covenant. A breach of contract is by definition the failure to perform the contract. No case law supports a contrary conclusion.

▮ Perdue's second argument fails because the confidentiality agreements are not in any sense implied contracts. An implied contract is a legal fiction created by a court "in order to justify payments for services rendered or goods provided under circumstances where there is no express contract." *Hoon v. Pate Constr. Co.,* 607 So.2d 423, 427 (Fla. 4th DCA 1992), *review denied,* 618 So.2d 210 (Fla.1993).[14] Under Florida law, the fiction of an implied contract cannot be maintained "when the rights of the parties are described in a written contract." *May v. Sessums & Mason, P.A.,* 700 So.2d 22, 26 (Fla.Dist.Ct. App.1997).

▮ The agreements at issue here are express, written contracts. The only open question was Hook's ability to enforce them. Under Count II, the jury found that Hook was a third-party beneficiary of the Pizza Hut Confidentiality Agreement by virtue of Pizza Hut's written agreement with Hook. Under Count III, the jury found that Hook was entitled to enforce

the Perdue Confidentiality Agreement, either because his signature on the contract made him an express party, or because Rice expressly assigned the contract to him. Because Hook's claims were based on a series of express, written agreements, a reasonably prudent layperson would not find that Hook was enforcing a contract that was "implied" by the circumstances.[15]

Thus, the exclusion is fatal to coverage under Counts II and III.

## Count I, Florida Uniform Trade Secrets Act

▮ Coverage for advertising liability does not extend when an insured does nothing more than advertise a product developed from wrongfully acquired trade secrets. *See Vickers v. Seaboard Sur. Co.,* No. 94-3864, 1996 U.S. Dist. LEXIS 19689, *22 (D.N.J. Feb. 5, 1996), *aff'd* without opinion, 107 F.3d 9 (3rd Cir.1997). In *McDonald's Corp. v. American Motorists Ins. Co.,* No. 97 L 144, (DuPage Cty Cir. Ct. Apr. 12, 2000), *aff'd,* 321 Ill.App.3d 972, 255 Ill.Dec. 67, 748 N.E.2d 771 (2001), McDonalds, the insured, advertised a new type of oven it had developed using misappropriated trade secrets. Coverage did not exist under the advertising liability provision of McDonald's policy, however, because there was no causal relationship between the advertisement itself and the damage award. To hold otherwise would extend advertising liability coverage to "virtually every misappropriation of trade secrets" because almost all products are advertised in some manner. *Id.* at 981, 255 Ill.Dec. 67, 748 N.E.2d 771.

---

14. For example, a contract might be implied where a nurse provides services to a patient with a reasonable expectation of compensation, even though there is no express contract requiring the patient to compensate the nurse. *See e.g., Aldebot v. Story,* 534 So.2d 1216 (Fla. 3d DCA 1988).

15. Webster's New World Dictionary defines "implied" as "suggested or understood without being openly or directly expressed."

■ Advertising liability coverage is appropriate, however, when the insured's damages arise within the four corners of the advertisement itself. In *Interface, Inc. v. Standard Fire Ins. Co.*, 2000 WL 33194955 (N.D.Ga.2000), the insured's advertisement wrongfully displayed a copyrighted carpet pattern. The court found that the holder of the copyright suffered a discrete injury each time the pattern was wrongfully reproduced. Thus, the injury caused by the advertisement itself was covered. *Id.* at *3.

For coverage to exist under Count I (FUTSA), the jury must have found that Hook's damages arose from the disclosure of his process within the four corners of the 1995 advertisements. If Hook's damages arose solely from his "preemption theory," the Advertising Liability provision does not cover Perdue's damages.[16]

Perdue concedes that Hook pursued the TenderReady preemption theory at trial. Perdue maintains, however, that the jury cannot have accepted this theory because (i) Hook was unable to identify a single fast food chain that would have licensed his process but for the existence of TenderReady, and (ii) Perdue itself was unable to market TenderReady to fast food chains.[17]

Thus, Perdue argues, the jury must have found that Perdue misappropriated the process by disclosing it. At trial, Hook contended that his entire process was a trade secret. Perdue maintains, however, that on cross examination Hook conceded that all of the steps in the process were known in the industry except for the crucial "rethermalization" step. Hook's process requires microwaving the bagged chicken for several minutes to impart flavor by steeping the chicken in its own pre-spiced fats and juices. The chicken is then cut out of the bag and browned in a fryer or oven. Hook's trade secret, therefore, centers around this two-step "rethermalization" process that reheats the chicken quickly while at the same time making it tasty and crisp, like rotisserie chicken.

Perdue's argument continues that prior to 1995 it advertised TenderReady, but the advertisements did not describe the entire Hook process. Only in 1995, did the advertisements reveal the "key" rethermalization technique. Thus, there was a misappropriation by disclosure that was first accomplished within the four corners of advertisements published in 1995. All of Hook's damages were occasioned in 1995 because once the rethermalization process was disclosed, its value was destroyed.

■ Perdue contends that the "failure of performance" exclusion does not apply because its liability under Count I is statutory and not based on breach of contract. Under FUTSA, a defendant may be liable for the misappropriation or unauthorized disclosure of a trade secret even if he did not enter into a confidentiality agreement.

16. As stated above, Hook's preemption theory argued that: (i) Perdue had misappropriated his process and used it to develop TenderReady; and (ii) his ability to license his process to quick service restaurants had been usurped because restaurants could purchase TenderReady and thereby reap the benefits of his process without paying a licensing fee.

17. Perdue's contention that the damage award does not "add up" under Hook's preemption theory is not without merit. As stated by the Florida Appellate Court, Hook's theory of damages pushed against the "outer limits of the value potential of his process." *Hook II* at 13. This Court's role is not to revisit the correctness of the damage award against Perdue, however. Instead, this Court is obligated to determine "what was placed before the jury, and what was necessarily decided by the jury." *Ethicon, Inc. v. Aetna Cas. & Sur. Co.*, 737 F.Supp. 1320, 1331 (S.D.N.Y.1990).

All that is required is that: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and (2) the secret the plaintiff possessed was misappropriated, either by one who knew or had reason to know the secret had been improperly obtained or by one who used improper means to obtain it. *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, S.D.Fla.2001, 136 F.Supp.2d 1271.[18]

Moreover, Perdue maintains that claims under FUTSA are based exclusively on the duties imposed by the statute, as opposed to duties imposed by contract. In support of its position, Perdue cites the Comment to § 7 of the Uniform Trade Secrets Act, which states that the Act "does not apply to a duty voluntarily assumed through an express or an implied-in-fact contract." 14 Uniform Laws Annotated, Master Edition, "Uniform Trade Secrets Act with 1985 Amendments," Comment to § 7.[19]

■ Perdue's coverage theory fails. No reasonable fact finder could conclude from the Hook record that the jury found Perdue liable under a disclosure rather than a preemption theory.[20] The Court's conclusion is supported by a review of Hook's Complaint, the Jury Instructions, the Jury Verdict Form, the decision of the Florida Appellate Court that heard Perdue's Appeal, the Appellants brief Perdue

---

**18.** FUTSA defines "improper means" and "misappropriation" as follows:

(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

(2) "Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

1. Used improper means to acquire knowledge of the trade secret; or

2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

a. Derived from or through a person who had utilized improper means to acquire it;

b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. Ann. § 688.002, Florida Statutes (1995).

**19.** § 7 of the Uniform Trade Secrets Act was codified at § 688.008 of FUTSA. *See* Fla. Stat. Ann. 688.008, Historical and Statutory Notes..

**20.** The "failure to perform" exclusion also bars coverage under the FUTSA count. Perdue's liability can be traced back ultimately to the confidentiality agreements. It was under the agreements that Hook disclosed his process to Perdue. The jury expressly found that Perdue violated the agreements.

Under the FUTSA count, the *Hook I* court instructed the jury that Perdue must have obtained knowledge of Hook's process under circumstances giving rise to a duty of confidentiality. Tr. 3087 ("Thus, the necessary elements of secrecy is not lost if ... they disclose it under an obligation not to use or disclose it"). The court also told the jury that they need not find a violation of contract in order to find a violation of FUTSA. Tr. 3087 ("A written agreement of confidentiality or even an explicit oral agreement is not essential to maintain the trade secret"). The court did not, however, advise the jurors that the duty of confidentiality must have arisen from a source other than the confidentiality agreements themselves. It is, therefore, highly likely that the Hook jury found that the duty of confidentiality originated from the confidentiality agreements.

filed with the Florida Appellate Court, and the trial transcript.

### 1. Hook's Complaint

Hook's Complaint did not mention Perdue's 1995 advertisement in its recitation of the facts, or in its explanation of Count I (FUTSA). Instead, Hook's Complaint focused on Perdue's use of Hook's process to produce a competing line of roasted chicken. The Introduction section of the Complaint states that Perdue's misappropriation consisted of Perdue "marketing and selling" a product "developed using the process." p. 2. The Factual Background section of the Complaint makes an almost identical allegation. Finally, Count I (FUTSA), the count under which Perdue must establish coverage, alleges that "Perdue's use of the process without plaintiff's express or written consent constitutes misappropriation." ¶ 30.

### 2. The Jury Instructions

In its jury instructions, the *Hook I* court characterized Count I (FUTSA) as contending that Perdue misappropriated Hook's process to "produce and market" a "substantially similar" product. Tr. 3085–86. The *Hook I* court did not mention Perdue's advertising activities when framing Count I (FUTSA) for the jury.

### 3. The Jury Verdict Form

As regards Count I (FUTSA), the verdict form simply asks the jury: (i) whether Hook's process was a trade secret and (ii) whether Perdue had misappropriated Hook's trade secret. The verdict form does not mention Perdue's advertising activities.

The verdict sheet also asks the jury for the date on which Hook's damages accrued. The jury replied, "Oct. 29, 1993," the date on which Perdue initiated the TenderReady project. Thus, the factual basis for the jury's decision was not Perdue's advertising, which was published in 1995, but instead the creation of the TenderReady product.[21]

### 4. The Decision of the Florida Appellate Court

The Florida Appellate Court upheld the $25 million damage award for which Perdue is now seeking coverage under the Advertising Liability provision.. *See Perdue Farms, Inc. v. Hook*, 777 So.2d 1047 (Fla.Dist.Ct.App.2001)("*Hook II*"). According to the Florida Appellate Opinion, the award was premised on the theory that the "availability of Perdue's TenderReady product on the market" destroyed the value of, or preempted, Hook's process. *Id.* at 1051. Responding to Perdue's argument that Hook had been unsuccessful in marketing his process, the court pointed to Hook's contention that "the dissemination of the TenderReady *product* destroyed his ability to market the process." *Id.* (emphasis added). The court did not mention Perdue's advertising activities in its analysis of the $25 million award.

The Florida Appellate Court reversed Hook's award of prejudgment interest. In doing so, it stated that "Hook's theory of liability was that Perdue's TenderReady *product* destroyed his ability to market his process." *Id.* at 1055. (emphasis added). The court reversed the award of prejudgment interest for two reasons. First, the court found that it would be inequitable to

---

21. The Florida Appellate Court overturned the jury's finding that Hook's damages accrued as of October, 1993, stating that it was impossible to determine the exact date on which the introduction of the TenderReady product preempted Hook's attempts to license his process. Regardless, it is clear that the jury tied Hook's damages to the creation of the TenderReady product, not Perdue's advertising.

include prejudgment interest because Hook's award already stretched the "outer limits of the value potential of his process." *Id.* at 1054. Second, the court found that it was "impossible to determine any date upon which Hook's ability to market his process was lost by reason of the *presence* of TenderReady in the marketplace." *Id.* (emphasis added). In its analysis, the Florida Appellate Court clearly considered the misappropriation found by the jury to be the development and sale of Tender-Ready. *Id.* ("the jury could have found that ... Perdue's TenderReady was not a misappropriation").[22]

### 5. Perdue's Appellants Brief

In its appellants brief to the Florida Appellate Court, Perdue stated that, "Hook's theory of actual damages was that the availability of Perdue's TenderReady product deprived Hook of the ability to earn royalties on his process." Perdue's Appellant Brief, 60. Perdue did not suggest any other theory on which the damage award might be predicated.

### 6. The Trial Transcript

A review of the trial transcript shows that Hook, his attorney, and his witnesses, articulated a consistent theory of liability and damages, that Perdue had preempted Hook by introducing TenderReady to the quick service market. In his opening statement, Hook's counsel twice characterized Hook's case as contending that Perdue had destroyed the value of Hook's process by preempting Hook with the in-

troduction of TenderReady into the marketplace. Tr. 316–17, 321 ("As long as they are selling it on the market ... what does Mr. Hook have to sell to them? They're preempting him").[23] Hook's counsel did not argue in his opening statement that the value of Hook's process had been destroyed by Perdue's 1995 advertisements.

When he took the stand, Hook testified that the value of his process had been destroyed because TenderReady was "out on the street" and he was no longer the "exclusive provider" of the technology. Tr. 978, 990, 1107, 1096. Hook's partner, George Rice, testified that TenderReady "effectively completely preempts us." Tr. 528. Richard T. Good, the expert called in support of Hook's damage theory, testified that the introduction of TenderReady preempted Hook's process and reduced its value to zero. Tr. 1388, 1448. Good also testified under cross-examination that it would have been "unethical" for Hook to sell his technology given Perdue's presence in the market. Tr. 1440. None of these witnesses argued that the preemption of Hook's process had resulted from Perdue's 1995 advertisements. All of the witnesses clearly tied the misappropriation of Hook's process to the development and sale of a competing product.

Hook's counsel continued this theme into his closing statement, charging Perdue with developing a "secret project" and then selling it "out on the street." Tr. 3076. Hook's counsel also stated that Hook's primary focus since 1996 had been

---

**22.** The Florida Appellate Court specifically mentioned Perdue's 1995 advertising activities in this section of its decision, but declined to find that Hook's damages arose in February, 1995, further indicating that it did not view the advertising as the basis for Hook's damages.

**23.** Perdue's counsel also characterized Hook's case as proceeding under a preemption theory. Tr. 331–32. ("he claims that Perdue Farms has misappropriated it or used it without his consent ... it's Perdue's position that the product that the fuss is being made about here ... was a product that Perdue learned how to make ... before Mr. Hook came on the scene").

to stop Perdue from using his process, and that Perdue had refused to "give [the process] back." Hook's counsel also contended that Hook would be able to successfully license his process once the competing TenderReady product was removed from the market. Tr. 3000–01, 3077. Hook's counsel never argued that Perdue's 1995 advertisements destroyed the value of Hook's process. Hook's counsel did reference the advertisements, but only to demonstrate that: (i) the product described in the advertisements used Hook's process; and (ii) Perdue claimed in its advertisements that TenderReady was a marvelous new product, a claim that contradicted Perdue's trial position that Hook's process was neither new nor valuable.

The record does not demonstrate that Perdue's 1995 advertising was the factual basis for the $25 million award under Count I (FUTSA). Instead, it is clear from the above-cited record that the jury based the award on the use of the Hook process in the development of a competing product. As the Florida Appellate Court stated when affirming the very same damages that Perdue is now attempting to characterize as stemming from its advertising, it was the "availability of Perdue's TenderReady product on the market" that formed the factual basis for the award. *See Hook II* at 14.

### Conclusion

In addition to arguing that National and Federal have a duty to indemnify, Perdue's Motion for Partial Summary Judgement also argues that National breached its duty to defend Perdue at trial. The duty to defend issue has been an afterthought in the proceedings thus far and requires additional briefing. This issue affects National, but not Federal.

Accordingly, both Perdue and National's Motions are DENIED in part, and GRANTED in part, and Federal's Motion is GRANTED. Summary judgment is awarded to National and Federal as regards their duty to indemnify Perdue. Summary judgment is DENIED without prejudice to both Perdue and National as regards National's duty to defend. The Court will issue a briefing schedule.