# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 08-0531

LINDA L. SWINNEY, APPELLANT,

v.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided October 7, 2009)

*Daniel G. Krasnegor* and *Todd M. Wesche,* both of Richmond, Virginia, were on the brief for the appellant.

*John H. Thompson*, Acting General Counsel; *R. Randall Campbell*, Assistant General Counsel; *David L. Quinn*, Deputy Assistant General Counsel; and *Nathan Paul Kirschner*, Appellate Attorney; all of Washington, D.C., were on the brief for the appellee.

Before HAGEL, MOORMAN , and DAVIS, *Judges*.

HAGEL, *Judge*: Before the Court is Linda L. Swinney's appeal of a December 4, 2007, Board of Veterans' Appeals (Board) decision denying entitlement to reimbursement or payment for unauthorized private medical expenses for the period of January 28 to February 2, 2006. Record (R.) at 1-14. This matter was referred to a panel of the Court to consider the types of evidence that may be analyzed when determining whether a person may be reimbursed for emergency treatment furnished in a non-VA facility pursuant to 38 U.S.C. § 1725[1] and 38 C.F.R. § 17.1002. Because the

---

[1] This statute provides, in pertinent part:

(a) General authority.

    (1) Subject to [certain limitations], the Secretary shall reimburse a veteran described in subsection (b) for the reasonable value of emergency treatment furnished the veteran in a non-Department facility.

    (2) In any case in which reimbursement is authorized under subsection (a)(1), the Secretary,

Board implicitly required medical evidence of an emergency situation in contravention of statute and regulation, the Court will vacate the December 2007 Board decision and remand the matter for readjudication consistent with this decision.

---

in the Secretary's discretion, may, in lieu of reimbursing the veteran, make payment of the reasonable value of the furnished emergency treatment directly--

(A) to a hospital or other health care provider that furnished the treatment; or

(B) to the person or organization that paid for such treatment on behalf of the veteran.

. . .

(f) Definitions.--For purposes of this section:

(1) The term "emergency treatment" means medical care or services furnished, in the judgment of the Secretary--

(A) when Department or other Federal facilities are not feasibly available and an attempt to use them beforehand would not be reasonable;

(B) when such care or services are rendered in a medical emergency of such nature that a prudent layperson reasonably expects that delay in seeking immediate medical attention would be hazardous to life or health; and

(C) until–

(i) such time as the veteran can be transferred safely to a Department facility or other Federal facility and such facility is capable of accepting such transfer; or

(ii) such time as a Department facility or other Federal facility accepts such transfer if–

(I) at the time the veteran could have been transferred safely to a Department facility or other Federal facility, no Department facility or other Federal facility agreed to accept such transfer; and

(II) the non-Department facility in which such medical care or services was furnished made and documented reasonable attempts to transfer the veteran to a Department facility or other Federal facility.

2

## I. FACTS

Ms. Swinney served on active duty in the U.S. Army from December 9, 1997, to January 20, 1998. R. at 18. She has a single service-connected condition, scoliosis/kyphosis[2] of the thoracic spine, rated 30% disabling. R. at 23-26. She was admitted to the Bay Pines, Florida, VA medical center on December 29, 2005, with complaints of vomiting. R. at 30. Testing revealed a hiatal hernia with red mucosa at the esophageal junction. R. at 373. Ms. Swinney was discharged from the medical center on January 6, 2006, with a diagnosis of erosive esophagitis, hiatal hernia, and back pain. R. at 342. On January 25, 2006, Ms. Swinney sought treatment at the emergency room at the Bay Pines VA medical center with complaints of inability to swallow, nausea, vomiting, and upper abdominal pain, and was admitted to the medical center. R. at 313, 318. A small bowel follow-through examination showed a moderate sized hiatal hernia with significant gastroesophageal reflux. R. at 325. An upper endoscopy performed on January 27, 2006, showed a hiatal hernia, esophagitis, and congestive gastropathy. R. at 279. A hospital progress note indicated that Ms. Swinney had expressed a desire to stay in the hospital to rest for three to four days but that the doctor opined that there were "no objective findings to account for [Ms. Swinney's] symptoms." R. at 276. On January 28, 2006, after being advised that she would be discharged, Ms. Swinney returned to her room and vomited on the floor. R. at 257. A physician was summoned and Ms. Swinney was provided with antiemetic[3] medication and discharged. *Id.* Approximately 30 minutes later, she arrived at the emergency room at the Bay Pines VA medical center, where she was advised that re-admission was not needed. R. at 258. An addendum to a nursing progress noted stated that Ms. Swinney "was stable when leaving the [emergency room] and no nausea and vomiting were noted at this time." *Id.*

Sometime later on January 28, 2006, the same day she was discharged by the Bay Pines VA medical center, Ms. Swinney was admitted to St. Petersburg (Florida) General Hospital (St. Petersburg General) through the emergency room with complaints of abdominal pain for the past

---

[2] Scoliosis is "an appreciable lateral deviation in the normally straight vertical line of the spine." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1706 (31st ed. 2007). Kyphosis is "abnormally increased convexity in the curvature of the thoracic spinal column as viewed from the side." *Id.* at 1007.

[3] Antiemetics are anti-nausea medications. *See id.* at 616.

3

three days, with vomiting, diarrhea, and inability to keep liquid or food down. R. at 405, 442. Her temperature at the time of admission was reported as 96.9 degrees. R. at 408. An upper endoscopy revealed a hiatal hernia and gastritis. R. at 406. The discharge summary from February 2, 2006, stated that "[s]lowly and steadily with the treatment, [Ms. Swinney's] condition started improving. . . . By the time of discharge on 2/2/2006, [her] abdominal pain resolved and . . . [she] was discharged home in stable and satisfactory condition." *Id.* A discharge note from one of Ms. Swinney's physicians at St. Petersburg General stated:

> [Ms. Swinney] was admitted on 1/28/2006 to [St. Petersburg General]. She had entered into [emergency room] with a high temperature of 103, vomiting[,] not able to keep liquids or food down; [a]bdominal pain. [She] had been discharged from VA medical hospital [emergency room] on 1/28/06. Only a two[-]day stay starting 1/26/06. Ms. Swinney wasn't feeling well after her discharge[] with VA hospital, and [emergency room] there wasn't going to admit her again[.] [She] came to [this hospital]. Very surprised to hear that [she] . . . was discharged from VA medical hospital early, for when she arrived at [emergency room] at [St. Petersburg General], she was still sick.

R. at 442.

In early 2006, VA received hospital bills for Ms. Swinney's treatment at St. Petersburg General, totaling $55,356.68. R. at 140-57. The chief medical officer at Bay Pines VA medical center determined that Ms. Swinney's admission at St. Petersburg General had been non-emergent and declined payment or reimbursement. *See* R. at 164, 166. In March 2006, the Bay Pines VA medical center advised Ms. Swinney that payment for her hospitalization at St. Petersburg General was denied because her "admission was non-emergent and no pre-authorization was received." R. at 101. Ms. Swinney perfected an appeal of that decision, asserting that she was still sick upon her discharge from the Bay Pines VA medical center and that she believed she had been discharged too soon, because she was still feverish and suffering from chest pain, vomiting, and dizziness. R. at 102, 383-84. She also stated that she did not think that the emergency room doctor at St. Petersburg General would have admitted her if it had not been an emergency. R. at 383-84.

In December 2007, the Board issued the decision on appeal denying entitlement to reimbursement or payment for unauthorized private medical expenses at St. Petersburg General for the period of January 28 to February 2, 2006. Relevant to the issue on appeal, the Board noted that

4

payment for emergency services for non-service-connected conditions in non-VA facilities may be authorized under 38 U.S.C. § 1725 and 38 C.F.R. §§ 17.1000-1003. R. at 8. The Board outlined the requirements for reimbursement, including that

> the claim for payment or reimbursement for the initial evaluation and treatment is for a condition of such a nature that a prudent layperson would have reasonably expected that delay in seeking immediate medical attention would have been hazardous to life or health (this standard would be met if there were an emergency medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that a prudent layperson who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in placing the health of the individual in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part).

38 C.F.R. § 17.1002(b) (2007).[4]

---

[4] This regulation, in its entirety, provides:

Payment or reimbursement under 38 U.S.C. 1725 for emergency services may be made only if *all* of the following conditions are met:

> (a) The emergency services were provided in a hospital emergency department or a similar facility held out as providing emergency care to the public;

> (b) The claim for payment or reimbursement for the initial evaluation and treatment is for a condition of such a nature that a prudent layperson would have reasonably expected that delay in seeking immediate medical attention would have been hazardous to life or health (this standard would be met if there were an emergency medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that a prudent layperson who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in placing the health of the individual in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part);

> (c) A VA or other Federal facility/provider was not feasibly available and an attempt to use them beforehand would not have been considered reasonable by a prudent layperson (as an example, these conditions would be met by evidence establishing that a veteran was brought to a hospital in an ambulance and the ambulance personnel determined that the nearest available appropriate level of care was at a non-VA medical center);

> (d) The claim for payment or reimbursement for any medical care beyond the initial emergency evaluation and treatment is for a continued medical emergency of such a nature that the veteran could not have been safely discharged or transferred to a VA or other Federal facility (the medical emergency lasts only until the time the veteran becomes stabilized);

> (e) At the time the emergency treatment was furnished, the veteran was enrolled in the VA health care system and had received medical services under authority of 38 U.S.C. chapter 17 within the 24-month period preceding the furnishing of such emergency treatment;

5

The Board noted that the chief medical officer of the Bay Pines VA medical center had reviewed the request for payment and denied it because he determined that the matter was non-emergent, but that his statement included "little additional explanation for this opinion." R. at 10. The Board also acknowledged the discharge note from the St. Petersburg General physician who had expressed surprise at Ms. Swinney's discharge from Bay Pines because she was "still sick" when she arrived at St. Petersburg General. R. at 11; *see* R. at 442. The Board then stated that, "[h]aving reviewed the complete record," the care provided to Ms. Swinney by St. Petersburg General "was not rendered for 'emergency treatment' as defined by applicable law." R. at 11. The Board acknowledged Ms. Swinney's statements that her treatment at St. Petersburg General was for "a medical emergency of such a nature that delay would have been hazardous to life or health," but found that, as a layperson, she was only competent to report her symptoms, not to "opine as to her emergent status." *Id.*

The Board, relying on *Cotton v. Brown*, 7 Vet.App. 325 (1995), stated that whether a situation is a medical emergency is a medical question best answered by a physician. *Id.* Accordingly, the Board reviewed the medical evidence of record, including the St. Petersburg General records and physician's statement and the Bay Pines VA medical center records from Ms.

---

(f) The veteran is financially liable to the provider of emergency treatment for that treatment;

(g) The veteran has no coverage under a health-plan contract for payment or reimbursement, in whole or in part, for the emergency treatment (this condition cannot be met if the veteran has coverage under a health-plan contract but payment is barred because of a failure by the veteran or the provider to comply with the provisions of that health-plan contract, e.g., failure to submit a bill or medical records within specified time limits, or failure to exhaust appeals of the denial of payment);

(h) If the condition for which the emergency treatment was furnished was caused by an accident or work-related injury, the claimant has exhausted without success all claims and remedies reasonably available to the veteran or provider against a third party for payment of such treatment; and the veteran has no contractual or legal recourse against a third party that could reasonably be pursued for the purpose of extinguishing, in whole or in part, the veteran's liability to the provider; and

(i) The veteran is not eligible for reimbursement under 38 U.S.C. § 1728 for the emergency treatment provided (38 U.S.C. § 1728 authorizes VA payment or reimbursement for emergency treatment to a limited group of veterans, primarily those who receive emergency treatment for a service-connected disability).

38 C.F.R. § 17.1002 (emphasis added).

Swinney's January admission. The Board determined that the St. Petersburg General records contained inconsistencies, particularly with respect to Ms. Swinney's temperature on admission, and that the St. Petersburg General physician's statement that Ms. Swinney was "still sick" upon admission to there "is not akin to stating that [she] was in an 'emergent state.'" *Id.*

In contrast, the Board stated that the chief medical officer of Bay Pines, in his review of the matter, had considered Ms. Swinney's entire record. R. at 12. The Board noted that Ms. Swinney was discharged from Bay Pines in stable, "although personally agitated," medical condition, and that his opinion was based on the entirety of her two-day stay at Bay Pines and was concurred with by two additional physicians. *Id.* The Board noted that this was important because, "it is difficult to foresee how her condition deteriorated from this stable condition to an emergent state in less than two hours, especially since she did not report a 'sudden' onset of symptoms" when she presented at St. Petersburg General emergency room. *Id.*

In reaching its conclusion that Ms. Swinney's condition at the time of admission to St. Petersburg General was non-emergent, the Board stated that it had relied on VA medical records and opinions, as well as the records associated with Ms. Swinney's stay at St. Petersburg General. "Unfortunately," the Board wrote, "such records fail to demonstrate that her condition upon visiting [St. Petersburg General] were such that a prudent layperson would have reasonably expected that delay in seeking immediate medical attention would have been hazardous to life or health." *Id.* In support for this finding, the Board also noted that the physicians at Bay Pines had "repeatedly told" Ms. Swinney that her condition was stable and that she did not need additional acute care. R. at 13.

On appeal, Ms. Swinney makes a single argument: that the Board applied the wrong standard when it considered whether reimbursement or payment was warranted under 38 U.S.C. § 1725 and 38 C.F.R. §§ 17.1000-1003. Specifically, Ms. Swinney contends that the Board erroneously required medical evidence of a medical emergency, instead of considering whether a "reasonable prudent layperson" would believe that a delay in seeking medical treatment for her condition would result in serious jeopardy to health, impairment to bodily functions, or dysfunction of any body part. Appellant's Brief (Br.) at 7-8 (citing 38 U.S.C. § 1725(f)(1)(B) and 38 C.F.R. § 17.1002(b)). Ms. Swinney argues that the Board's reliance on *Cotton* is misplaced because that case dealt with

7

reimbursement for unauthorized medical services under 38 U.S.C. § 1728,[5] which she asserts contains no "prudent layperson" provision. Appellant's Br. at 8. Finally, Ms. Swinney contends that the Board's error in this case is prejudicial because the application of an incorrect standard prevented the Board from considering whether she met the other requirements of § 17.1002(b) that would entitle her to reimbursement or payment for medical expenses incurred at St. Petersburg General. Appellant's Br. at 11-12.

---

[5] This statute, in its entirety, provides:

(a) The Secretary shall, under such regulations as the Secretary prescribes, reimburse veterans eligible for hospital care or medical services under this chapter for the customary and usual charges of emergency treatment (including travel and incidental expenses under the terms and conditions set forth in section 111 of this title) for which such veterans have made payment, from sources other than the Department, where such emergency treatment was rendered to such veterans in need thereof for any of the following:

(1) An adjudicated service-connected disability.

(2) A non-service-connected disability associated with and held to be aggravating a service-connected disability.

(3) Any disability of a veteran if the veteran has a total disability permanent in nature from a service-connected disability.

(4) Any illness, injury, or dental condition of a veteran who--

(A) is a participant in a vocational rehabilitation program (as defined in section 3101(9) of this title); and

(B) is medically determined to have been in need of care or treatment to make possible the veteran's entrance into a course of training, or prevent interruption of a course of training, or hasten the return to a course of training which was interrupted because of such illness, injury, or dental condition.

(b) In any case where reimbursement would be in order under subsection (a) of this section, the Secretary may, in lieu of reimbursing such veteran, make payment of the reasonable value of emergency treatment directly--

(1) to the hospital or other health facility furnishing the emergency treatment; or

(2) to the person or organization making such expenditure on behalf of such veteran.

(c) In this section, the term "emergency treatment" has the meaning given such term in section 1725(f)(1) of this title.

In response, the Secretary argues that Ms. Swinney has "grossly missrepresent[ed]" the Board's decision. Secretary's Br. at 3. In particular, the Secretary contends that a plain reading of the Board's decision shows that the Board did, in fact, apply the prudent layperson standard. Secretary's Br. at 3-4. Moreover, the Secretary argues, the Board's finding that reimbursement or payment was not warranted in Ms. Swinney's case is supported by the facts and the law. The Secretary asserts that "the core of the issues is whether a reasonably prudent layperson would follow the medical advice of their doctor," and that because Ms. Swinney's physicians at Bay Pines had repeatedly told her that her condition was stable and that she no longer needed hospital care, it was unreasonable for her to seek treatment at St. Petersburg General. Secretary's Br. at 6-7. With respect to the Board's reliance on *Cotton*, the Secretary argues that the Board cited *Cotton* "only for the proposition that what constitutes a 'medical emergency' is a medical question best answered by a physician," and that the Board did not use *Cotton* "to get around the prudent layperson standard" of section 1725. Secretary's Br. at 7-8.

## II. ANALYSIS

The statute at issue here, 38 U.S.C. § 1725, was introduced as part of the Millennium Health Care and Benefits Act, Pub. L. No. 106-117, §§ 111, 113 Stat. 1545 (1999). Under this statute, Congress authorized the Secretary to reimburse a non-service-connected veteran for unauthorized emergency medical treatment where the veteran meets certain eligibility requirements. For purposes of the statute, and relevant to this appeal, "emergency treatment " is defined as

medical care or services furnished, in the judgment of the Secretary–

(A) when Department or other Federal facilities are not feasibly available and an attempt to use them beforehand would not be reasonable; [and]

(B) when such care or services are rendered in a medical emergency *of such nature that a prudent layperson reasonably expects that delay in seeking immediate medical attention would be hazardous to life or health*.

38 U.S.C. § 1725(f)(1)(A-B) (emphasis added). The implementing regulation contains a corresponding "prudent layperson" standard. Specifically, 38 C.F.R. § 17.1002(b) adds that

The claim for payment or reimbursement for the initial evaluation and treatment is for a condition of such a nature that *a prudent layperson would have reasonably expected that delay in seeking immediate medical attention would have been hazardous to life or health* (this standard would be met if there were an emergency medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that a prudent layperson who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in placing the health of the individual in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part);

(emphasis added). Ms. Swinney's only argument is that the Board incorrectly applied this regulation. The Court agrees.

Although the Board appeared to agree that Ms. Swinney's claim should be analyzed under the "prudent layperson" standard (*see* R. at 12, 13), the Court concludes that the Board, in fact, incorrectly required medical evidence that Ms. Swinney's condition was actually emergent at the time she sought treatment at St. Petersburg General. First, the Board misstated the issue: "[T]he question before the Board is not how [Ms. Swinney] was treated at Bay Pines VA [medical center]. *Rather, it is whether the treatment she received at [St. Petersburg General] was for an emergent condition.*" R. at 12. Section 17.1002(b) does not require that the treatment the veteran receives from the private facility be for an emergent condition. That portion of the regulation clearly requires only that the Board determine whether, under the circumstances present at the time the veteran sought treatment at the private facility, a prudent layperson would reasonably expect that her condition was such that delay in seeking treatment would be hazardous to her health or life. *See, e.g.*, *Huaman-Cornelio v. Board of Immigration Appeals*, 979 F.2d 995, 999 (4th Cir. 1994) (stating that the standard for proving a "well-founded fear of persecution" under the Immigration and Nationality Act (8 U.S.C. § 1101 et seq) is the reasonable person test, which includes, among other factors, the requirement that a reasonable person in the circumstances would fear persecution); *Lachance v. White*, 174 F.3d 1378, 1380-81 (Fed. Cir. 1999) (holding that the proper reasonable person test in the context of the Whistleblower Protection Act (5 U.S.C. § 2302(b)(8)) is "could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence gross mismanagement"); *Horton v. Dep't of the Navy*, 66 F.3d 279, 283 (Fed. Cir. 1995) (criticizing, in a case involving the Whistleblower

Protection Act, the Merit Systems Protection Board for failing to "review [the] evidence from the viewpoint of [the employee's] 'reasonable belief'"); *Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co.*, 197 F.Supp. 2d 370, 377 (D. Md. 2002) (stating that "a reasonably prudent layperson" refers to a reasonably prudent person in the same position as the plaintiff). This is not to say that, when weighing the totality of the circumstances to determine whether a prudent layperson would consider the situation emergent, the Board may not consider evidence regarding whether the treatment ultimately rendered was for an emergent condition. *See e.g., Huaman-Cornelio*, 979 F.2d at 999 (stating that the reasonable person test "has both subjective and objective elements"); *Lachance,* 174 F.3d at 1381 (holding that "[a] purely subjective perspective of an employee is not sufficient" to determine if that employee "reasonably conclude[d] that the actions of the government evidence gross mismanagement"). However, that determination, made in hindsight, is not dispositive of whether the claimant is eligible for reimbursement under section 1725. If Congress had intended that fact to be outcome-determinative, it would not have included the "prudent layperson" standard.

Second, the Board stated that its position was supported because three physicians at Bay Pines had repeatedly told Ms. Swinney prior to discharge that her condition was stable. Although the Board does not say as much, the implication is clear: A prudent layperson would take the advice of her physicians when they tell her she is stable and needs no additional treatment. This implication, however, is both unpersuasive and dangerous. If the Board were correct that a physician's statement as to a claimant's health is dispositive as to what a reasonable person would believe about the state of her health, a veteran who has been told by a doctor that she is stable and has no need for additional care may not seek additional–and perhaps life-saving–treatment for fear of not being able to pay for it, even when she feels, as Ms. Swinney did, "alarm[ed]" by her condition. R. at 895. Moreover, the Board's position elevates advice from even negligent physicians over the reasonable judgments of the person seeking treatment. This is simply unreasonable and not what the clear wording of the statute and regulation requires. Again, the Court does not suggest that the advice of a physician may not be considered among the totality of the circumstances in determining whether a "prudent layperson" would have believed that delaying treatment would be hazardous to her life or health. It is, however, not to be treated as a dispositive factor.

11

Third, the Board dismissed Ms. Swinney's own statements regarding her belief that delaying seeking treatment for her condition would be hazardous to her health, finding that, as a layperson, she lacked the medical expertise necessary to determine if her condition was emergent. In support of this statement, the Board cited this Court's decision in *Cotton* for the proposition that the question of whether a situation is a "medical emergency" is best answered by a medical professional. R. at 11 (citing *Cotton*, 7 Vet.App. at 327). In fact, the Court in *Cotton* held only that the Board had erred in failing to provide adequate reasons or bases for denying reimbursement for medical expenses under a different statute–38 U.S.C. § 1728–because the Board failed to analyze the favorable and unfavorable medical evidence of record, including conflicting medical opinions regarding whether the treatment the appellant received was "rendered in a medical emergency of such nature that delay would have been hazardous to life or health." *Cotton*, 7 Vet.App. at 327-28. Notwithstanding the Board's misstatement of *Cotton*'s holding (which the Secretary failed to correct in his brief), the Board's reliance on such a proposition is further evidence that it required medical evidence that a medical emergency did, in fact, exist to grant a claim for reimbursement under the standard dictated by section 1725.[6] The Board's summary dismissal of Ms. Swinney's lay statements evidences a disregard for the requirement of section 1725 and §17.1002 that the Board consider the claimant's state of mind at the time she sought private treatment and evaluate her actions in light of what a prudent layperson would do under the same circumstances. 38 U.S.C. § 1725(f)(1)(B); 38 U.S.C. § 17.1002(b); *see Horton*, 66 F.3d at 283; *Purdue*, 197 F.Supp. 2d at 377.

Fourth, as further evidence of the non-emergent status of Ms. Swinney's condition, the Board stated that, although Ms. Swinney arrived at St. Petersburg General complaining of "severe pain" and vomited once in the emergency room, "within four hours of her arrival her pain level began to decrease," and by the next day, nursing notes indicated that she was in no acute distress. R. at 12. The Board does not explain why the decrease in Ms. Swinney's pain level within four hours and the

---

[6] Contrary to Ms. Swinney's assertion in her briefs, section 1728 does, in fact, rely on the "prudent layperson" standard. That statute expressly states that "the term 'emergency treatment' has the meaning given such term in section 1725(f)(1)." 38 U.S.C. § 1728(c). Section 1725(f)(1), in turn, provides that "emergency treatment" is medical care or services furnished, in pertinent part, "when such care or services are rendered in a medical emergency of such nature that a prudent layperson reasonably expects that delay in seeking immediate medical attention would be hazardous to life or health." 38 U.S.C. § 1725(f)(1)(B). The Court expects that Ms. Swinney's confusion stems from the amendment of section 1728 in 1999 to add the prudent layperson standard; at the time *Cotton* was decided, the statute contained no such standard. *See* 38 U.S.C. § 1728 (1995).

absence of acute distress the following day, both of which occurred *after* Ms. Swinney sought treatment at St. Petersburg General, are relevant to the question of what a prudent layperson would believe about her condition *at the time she sought treatment* at St. Petersburg General. In contrast, Ms. Swinney's pain on arrival *is* relevant; indeed, the VA's own regulation states that "severe pain" is a symptom that may cause a prudent layperson to reasonably expect that the absence of immediate medical attention would be hazardous to her life or health. *See* 38 C.F.R. § 17.1002(b).

Finally, the Board concluded: "As the competent evidence of record, namely the Bay Pines VA [medical center] discharge records and emergency department records dated January 28, 2006, the March 2006 [Bay Pines] [chief medical officer] opinion, and [St. Petersburg General] records, especially triage records, show that [Ms. Swinney's] conditions were not emergent." R. at 13. The Court first must question the Board's reliance on the March 2006 chief medical officer opinion, given that the Board found that the report, beyond stating that Ms. Swinney's condition was not emergent at the time she sought treatment at St. Petersburg General, offered "little additional explanation for this opinion." R. at 10. Second, it is clear from this statement that the Board, despite giving lip-service to the "prudent layperson" standard elsewhere in the decision, relied only on medical evidence to deny Ms. Swinney's claim.

In sum, the Court concludes that both medical and lay evidence may be considered in a prudent-layperson evaluation; however, because neither section 1725 nor § 17.1002 require a medical finding of an emergency, the Board erred in implicitly *requiring* medical evidence. Accordingly, the Court must remand the matter for readjudication. *Tucker v. West*, 11 Vet.App. 369, 374 (1998) ("[W]here the Board has incorrectly applied the law . . . a remand is the appropriate remedy."); *see Hicks v. Brown*, 8 Vet.App. 417, 422 (1995).

On remand, Ms. Swinney is free to submit additional evidence and argument in accordance with *Kutscherousky v. West*, 12 Vet.App. 369, 372-73 (1999) (per curiam order). *See Kay v. Principi*, 16 Vet.App. 529, 534 (2002). The Board must reconsider Ms. Swinney's case applying the correct "prudent layperson" standard articulated in § 17.1002(b).[7] To that end, the Court will order

---

[7] The Court is concerned that a portion of the analysis in the decision on appeal could be construed as examining the propriety of reimbursement for non-emergency treatment, which would be covered under 38 C.F.R. § 17.1002(d). *See* R. at 11. On remand, the Board should take pains to specify which portion of § 17.1002 is being applied.

that a copy of Ms. Swinney's briefs be included in the record before the Board on remand.  If the Board finds that a prudent layperson in Ms. Swinney's situation would have believed that her condition was such that delay in seeking medical treatment would be hazardous to life or health, the Board should proceed to consider the remaining requirements of § 17.1002.

### III.  CONCLUSION

Upon consideration of the foregoing, the December 4, 2007, Board decision is VACATED and the matter is REMANDED for reajudication consistent with this decision.